JAMES MURCHIE and others *vs.* EPHRAIM C. GATES.

Washington.    Opinion June 15, 1886.

*Waters.    Prescription.    Charge of judge.    Practice.*

A right to the artificial flow of water through a water course, can be acquired by prescription.

It is not an expression of opinion for the presiding justice to review the evidence, or to state isolated items of evidence.

ON EXCEPTIONS and motion to set aside the verdict.

Case for diverting the water from the plaintiffs' water mills in Calais.

The opinion states the facts.

In his charge the presiding justice instructed the jury, among other instructions as stated below, and to so much as is printed in italics the defendant alleged exceptions to as expressing an opinion to the jury :

" The plaintiffs must satisfy you of the extent of their damage, by reason of the diversion of the water ; but you must determine upon the whole evidence, what damage they sustained by the wrongful diversion of the water. *William A. Murchie, one of the plaintiffs, testified in regard to the damage. He gave you as best he could, I suppose, the facts entering into this question. He stated to you the fair rental value of the mill per thousand* for manufacturing long lumber. I do not know but he stated the fair value of the use of the mill for manufacturing short lumber, the shingles and lathes ; if he did it has escaped me. And you will remember, he made his estimate of the quantity which each gang would cut less, by reason of the want of water, than it would have done if they had had their usual flow of water, without any diversion ; five thousand a day, I think, to each gang ; and then the diminished quantity of short lumber. Then there is another element that enters into the consideration of the question of damage ; and that is the expense of the crew and everything that enters into the running of the mills which is to be applied to the diminished quantity manufactured, rather than

to the full quantity that might have been manufactured if the plaintiffs had had the water which they were entitled to.

"Mr. Murchie told you the difference in the expense per thousand, according to his estimate, between the one basis and the other. Now so far as his testimony is matter of opinion, it is merely opinion of the witness based upon the facts which he has stated to you. It is competent evidence to submit to the jury, and still a jury is not required to go by it, because in all cases involving matters of this kind where witnesses are called on the one side and the other to give an opinion, we are accustomed to find a great difference in the opinion of men of equal intelligence and equal opportunities for observation,— equal knowledge, and equal integrity.

"The opinion may be some aid, but when you have the facts upon which it is based, it is competent for you to form your own opinion upon the facts, disregarding the opinion of the witnesses. It is all a matter addressed to your good common sense and sound judgment, and if you find for the plaintiff, you must determine what they are fairly and justly entitled to receive as their damages."

*A. McNichol*, and *George A. Curran*, for plaintiffs, cited, as cases in which this same water power was involved : *Munroe* v. *Gates*, 42 Maine, 178, and 48 Maine, 463 ; *Stickney* v. *Munroe*, 44 Maine, 199 ; *Munroe* v. *Stickney*, 48 Maine, 458. On Water Easements : Wash. Easements, 368 and cases cited ; *Delaney* v. *Boston*, 2 Harr. 489 ; 44 Maine, 155 ; 63 Maine, 434 ; 44 Maine, 167 ; 28 Maine, 554 ; Wash. Easements, §§ 17, 20, and cases cited ; Angell, Watercourses, 400–404.

*F. A. Pike*, for defendant.

The mill privilege on which defendant's mills stand is an artificial privilege. Artificial water courses are those where either the sources or supply or the channels through which the water flows is provided by other than natural causes, and the question, how far and what rights are acquired in these by the owners of the land through which they flow, is a question of considerable and growing importance. Woods' Law of Nuisance,

§ 399.   In *Brown* v. *Chadbourne*, 31 Maine, 9, there was no question that Little River privilege of Brown was a "natural privilege." Neither Chadbourne nor anybody else had created it. It is equally clear in this case that without the expenditures of the defendant's grantors there could have been no "privilege" upon which to put the Murchie mills.

The general history of lumber water privilege in this state shows that proprietors with good reason consider them temporary where they are dependent upon dams. Take this dam, for instance, rudely built of logs for framework. It lasts but a comparatively short time.

In *Arkwright* v. *Gell*, 5 Mees. & W. 203, the plaintiff and his grantors had occupied an artificial stream eighty years and had erected extensive cotton mills on it. In *Gould* v. *Martyn*, 13 L. T. (N. S.) 74, the occupancy was very long and the court say the plaintiff acquired no right to the use of this stream by occupancy of twenty years. "The user of the easement of sending on the water of an artificial stream is of itself alone no evidence that the land from where the water is sent has become subject to the servitude of being bound to send on the water to the land of the neighbor below. The law relating to natural streams is entirely different."

The statute of this state providing that occupancy must be "adverse" as well as open, exclusive, and long continued, is in accordance with the decision. Surely there is no pretence in this case that the use of the water in the Murchie mills is "adverse" to Mr. Gates' rights. I need say nothing as to prescription after the recent opinion of the court in the Waterville cotton mill case, *Lockwood Co.* v. *Lawrence*, 77 Maine, 297.

EMERY, J.   There was evidence tending to establish the following as facts: In the St. Croix river, at Calais, is an island near the American shore. This island and the American shore for some distance above and below were formerly one estate. As early as 1810, dams and mills were built across from the shore to the island at the upper end. The title to this upper mill privilege afterwards came to the defendant. In 1824 was

the severance in the ownership. A conveyance was made of the land nearly opposite the lower end of the island, "with liberty to build a dam from the shore across to the island." The title to this lower privilege afterwards came to the plaintiffs.

The owners of the upper privilege had, from time to time during the last forty years, deepened the channel leading to their mills by removing rocks, etc. They had also for at least sixty years maintained a sheer dam running from the upper end of the island up the river and sheering out into the river. This sheer dam and the deepening of the channel conducted more or less of the waters of the St. Croix toward the American shore and down inside the island, which water would otherwise have flowed past outside of the island. For many years, at least forty, there were several mills on the upper privilege, between the shore and the island, which vented the water into the channel between the island and the shore. This flow of water down inside the island was the power for the mills upon the lower privilege. At the upper end of the island upon the upper privilege was also a mill called the Franklin mill which vented water into the main river outside the island. This water, of course, would not then flow to the lower mills.

In 1882, the defendant ceased using the inshore mills for a time, and diverted to the Franklin mill, and so down outside the island, the water that formerly flowed through the inshore mills, down inside the island to the plaintiffs' mills. For this diversion this action was brought and the jury have found there was such a diversion of the water.

The defendant contended that the plaintiffs could only claim of right the natural flow of the water, and could not acquire by user, however long continued, a legal right to the surplus or extra water artificially led into the channel by the defendant's sheer dam, and by his artificial deepenings of the channel. The judge in effect instructed the jury that the plaintiffs were entitled to all the water which naturally flowed in the channel between the island and the American shore, and which had been permitted to flow and they had been accustomed to receive at their mills and privilege, through the series of years down to 1882. That series

of years was admittedly more than twenty. The defendant construes this language as meaning that the plaintiffs might be entitled to more than the natural flow of water—that they might become entitled by prescription to the flow of such water as had been artificially led into the channel. We think it may be construed to mean that the plaintiffs were entitled to only so much of the natural flow as had been permitted to flow, lessening rather than enlarging their rights. The defendant contended for a prescriptive right to divert the water from the plaintiffs, and if applied to that contention, the instruction was in their favor. But we will examine the instruction as construed by the defendant.

If the plaintiffs, by a user sufficiently long and continuous, could acquire a prescriptive right to the accustomed flow of the water thus artificially led into this channel, the instruction is admittedly correct, but the defendant contends that the water course inside the island was in fact artificial, and that no prescriptive rights can be acquired therein.

The theory of prescriptive rights is, that there was a grant made of them. It is presumed that what one has so long permitted another to enjoy, he has granted to him. It would seem that a grant of water easements could be as readily presumed as a grant of any other easements. Such easements are valuable. Important interests often depend on them. They are the ordinary subjects of grants. The uses of them are as permanent as in the case of many other easements. They can be as easily defined. There would seem to be no good reason for excepting them from the general rule as to prescriptive rights. If prescription is to obtain at all as a foundation of legal rights, such a case as this would seem to be clearly within the principle.

We also think the case is within the authorities. In *Belknap* v. *Trimble*, 3 Paige, 577, Chancellor WALWORTH appositely said, " A proprietor at the head of a stream who has changed the natural flow of the waters, and has continued such change for more than twenty years, can not afterward be permitted to restore it to its natural state, where it will have the effect to destroy the mills of other proprietors below, which have been

erected with reference to such change in the natural flow of the stream." In *Delaney* v. *Boston*, 2 Harr. (Del.) 489, it was declared that one who has suffered water to flow through his land in a new artificial channel for twenty years, can not then divert it to the injury of riparian proprietors above, who have enjoyed the benefit of its flowing in such artificial channel. In *Shepardson* v. *Perkins*, 58 N. H. 354, the case last cited is quoted, and the principle applied in favor of mill owners below on the artificial channel. See also the English cases, *Wood* v. *Waud*, 3 Ex. 777 ; *Magor* v. *Chadwick*, 11 A. & E. 571.

The defendant urges that he can not be obliged to keep up the sheer dam, and that all the extra flow is caused by his works. He insists he is not bound to maintain works to lead water to the plaintiffs' mills, and that what extra water he gathers in by his own labor and appliances, he can use and set free in what direction is most convenient for him. This action, however, is not for neglect to keep up the dam, nor for refusing to gather water into the channel. The water, the diversion of which is complained of, had in fact come into the channel down as far as the upper mills. From that point such water had for more than twenty years flowed inside the island, and turned the plaintiffs' mills. It will be recalled that the owners of the upper mills conveyed the land below for a mill privilege ; that the purchasers built mills thereon which have been propelled by water from the upper mills for half a century.

The English cases cited by the defendant will be found upon examination to be cases of artificial supply rather than of artificial channel. In other English cases the distinction is clearly made, and the same principles applied to artificial, as to natural water courses. See language of POLLOCK, C. B., in *Wood* v. *Waud*, *supra*, and LENMAN, C. J., in *Magor* v. *Chadwick*, *supra*. Baron CHANNELL, in *Nuttall* v. *Bracewell*, L. R. 2 Ex. 1, tersely expresses the situation here when he says, " It is a natural flow or stream through an artificial channel." See also *Ivimey* v. *Stocker*, 1 L. R. Ch. 396. The case *Lockwood Co.* v. *Lawrence et als.* 77 Maine, 297, cited by defendant, recognizes

the doctrine that rights in the flow of water may be acquired by prescription. The rights contended for in that case, however, were not sustained by the evidence. In this case the evidence was for the jury.

The other exceptions to the judge's charge are not to his statement of the law, but rather to his statement of the positions of the parties—to his statements of the evidence, and to his comments upon various items of evidence. Complaint is made that he called the attention of the jury to certain testimony, and made no mention of other testimony upon the same point. It is urged that if he did not formally express an opinion, he by this course indicated an opinion upon facts in issue, contrary to R. S., c. 82, § 83.

If the legislature has the constitutional power to thus restrict the judiciary, a co-ordinate department under the same constitution with itself, it has not undertaken to forbid the presiding justice explaining the issues to the jury, or calling their attention to such of the testimony as he thinks will aid them. In many cases after a long trial with several issues, the judge must necessarily review more or less of the testimony, if there is to be any hope of an intelligent decision. In the performance of this important and delicate duty, he must have a large discretion which it would be impracticable for the law court to control. If either party thinks any material matter has been misstated, or over-stated, or omitted, he should ask for proper corrections before the jury are finally sent out. He ought not to be silent then, when corrections can be made, and complain afterward, when corrections can not be made. Rule of Court, No. 18; *State* v. *Benner*, 64 Maine, 267; *Bradstreet* v. *Rich*, 74 Maine, 308.

In this case there was no waiver of the rule, and no error was suggested to the judge until after the verdict.

The exceptions to the admission and exclusion of testimony are not pressed in the argument. We have carefully considered them and do not see that the defendants were prejudiced by the rulings.

Upon the motion for a new trial, we find evidence which, if

believed, warranted the verdict for the plaintiffs and also the amount of the damages assessed. The able argument for defendant might have led us to fix a smaller amount, but we can not say the amount fixed by the jury is clearly too large.

*Motion and exceptions overruled.*
*Judgment on the verdict.*

PETERS, C. J., DANFORTH, VIRGIN, FOSTER and HASKELL,, JJ., concurred.