J. A. HARP, Appellee, v. IOWA FALLS ELECTRIC COMPANY, Appellant.

**WATERS AND WATERCOURSES: Dams—Maintenance.** The owner
1 of a dam may not complain of a decree which reduces the height to which the dam may be maintained, when such reduction does not materially interfere with the efficiency of his works nor impose undue expense upon him, but does remove backwater from a long established upstream dam, and affords to the owner of the upstream dam a remedy more adequate than a judgment for damages.

**WATERS AND WATERCOURSES: Dams—Unlawful Interference.**
2 The owner of a dam which interferes, through backwater, with an upstream dam may not justify his conduct on the plea that the upstream owner might avoid the inconvenience by installing more modern machinery.

**WATERS AND WATERCOURSES:** Dams—Nonprescriptive Right.
3   The owner of a dam which backs water into an upstream dam, to
    its material injury, may not justify his conduct on the plea that
    he is maintaining the water level at the same point which was
    formerly maintained by the owner of a dam still farther down-
    stream, when the defendant has acquired no ownership of said
    latter right, and when said latter right affirmatively appears to be
    nonprescriptive.

*Appeal from Hardin District Court.*—G. D. THOMPSON, Judge.

JANUARY 20, 1923.

SUPPLEMENTAL OPINION JULY 12, 1923.

ACTION in equity, to enjoin defendant from maintaining its dam at such a height as to back the water up at plaintiff's dam and mill, and thus to destroy or to infringe upon plaintiff's right to the fall of the water. Plaintiff asks that the nuisance created thereby be abated, and that defendant be required to lower its dam, and to maintain it so as not to interfere with plaintiff's rights. Decree for plaintiff. Defendant appeals.—*Affirmed.*

*John A. Reed, Ralph Maclean, D. C. Chase, Jr.,* and *Herbert Huff,* for appellant.

*Lundy, Peisen & Soper,* for appellee.

PRESTON, C. J.—Plaintiff is the owner of a small tract of land near the city limits of Iowa Falls, Iowa, and on the Iowa River. Plaintiff had erected upon this real estate a stone mill, and crossing the river and connecting with the mill was a dam. The mill and dam had been continuously maintained for more than 50 years. The mill was built in 1857. Plaintiff continued in the uninterrupted use of his mill and water power until his rights were interfered with by the defendant, as he claims, about the time or shortly before this suit was brought. The lower or east line of plaintiff's property is about 100 feet below his dam.

1. WATERS AND WATERCOURSES: dams: main-tenance.

The evidence shows, and the trial court so found, that, at and before the time of the commission of the acts complained of, plaintiff's mill was being operated as a flour and feed mill, held

out to do, and doing, private custom and commission grinding; that the milling operations were conducted in good faith for the benefit of plaintiff, and as a public service to the community; that plaintiff was a miller, and has operated the mill and milling property for more than 20 years prior to the commencement of this suit. The defendant is an incorporated company, and likewise conducts its business for its own benefit, and as a public service. In 1915, it erected a large steam electric generating power plant, about half a mile down stream, and east from plaintiff's mill. It furnishes electric light and power service to Iowa Falls, and by high-tension lines serves neighboring towns. Defendant has constructed opposite its plant a dam three or four feet high, which is used to impound the water necessary for use in operating the condensers of its plant. It also supplied water for the Illinois Central and the Rock Island railroads during the winter and spring of 1920-1921. Defendant's dam is not a tight one, but is built of loose stone, cinders, etc. It does not extend the entire distance across the river, but has a sluiceway on each end, lower than the crest of the dam. It had no gates by which the stage of water could be regulated. The top is uneven. It is contended by appellant that, in the summer of 1919, it was necessary to make a pool at its plant, to secure a water supply, and that then defendant commenced to lay its dam and intake for the condensers, and that the dam and condensers were completed in January, 1920. This necessity arose, as defendant contends, because the Ellsworth dam, a half mile below, had been partially washed out and blown out in June, 1919, and prior thereto. Defendant's dam appears to have been added to from time to time, and in March, 1920, a considerable quantity of additional rock was added, at which time, it is the contention of plaintiff, the situation became acute, and materially added to the obstruction and interference with his milling operations. This action was commenced May 20, 1920. Defendant claims that it is necessary to so maintain its dam, in order to get sufficient water supply to operate the condensers. The intake through which the water was taken was approximately on the level of the bottom of the river, and defendant claims that the dam must be maintained to the depth of water, to preserve the suction of the pipes. From all the

evidence it is shown, and the trial court so found, that the maintenance of the dam as now maintained is unnecessary for the use of defendant and for the public service or public good; that it is feasible for defendant to lower or change the construction of its intake, without undue expense or hindrance in efficiently and profitably operating its plant; that the public necessity, welfare, and good can be fully served and satisfied; and that this may be done without the maintenance of any dam or obstruction in the river above a certain datum plane. The weight of the evidence is, and the court properly so found, that the elevation at the low point or thread of the stream, as it crossed plaintiff's lower property line, was 22.67, which elevation was taken with reference to the floor of defendant's light plant, as 36.62. The court therefore held that the dam should be maintained by the defendant only at an elevation point, 22.67, that being the elevation of the thread of the stream, and the plaintiff's lower property line. This was at Station 23, at the east line of plaintiff's property. The weight of the evidence is that, at the wheel in plaintiff's mill, 100 feet upstream from the east property line, there was .85 of a foot backwater. There is a stiff conflict in the evidence as to whether defendant has backed the water, defendant contending that this was not the fact. The record is voluminous. Six or seven engineers gave expert testimony. Their evidence is somewhat technical and complicated, and to some extent theoretical. There is testimony by a number of other witnesses, whose testimony is without substantial dispute except as it may be contrary to the expert testimony, in regard to actual conditions, and as to the depth and quantity of water at plaintiff's mill wheel and the flume, and the effect upon the wheel and the milling operations. It appears, too, that, prior to the obstruction by defendant's dam, there were riffles below plaintiff's dam, and at or near his east line; that this would be the condition if there were no backwater; but that, if there is backwater, there would be no riffles; that, after the obstruction, there were no riffles. Other circumstances are referred to. All the circumstances are gone into in detail. To attempt to review the evidence in detail would unduly extend the opinion. We therefore state our conclusions.

It is contended by appellee that the physical facts outweigh

the testimony of experts, which is, to some extent at least, theoretical. *Decorah Woolen Mill Co. v. Greer,* 58 Iowa 86; *Gibson & Kloppenstein v. Fischer & Orton,* 68 Iowa 29. About half a mile below the defendant's dam is another dam, referred to as the Ellsworth dam, which had been built a little more than ten years prior to the time defendant built its plant. The Ellsworth dam had been partly washed out, a year or two after defendant's plant was built, and in June, 1919, a part of it was blown out, to recover the body of a drowned person, it is said. The contentions of the parties as to whether or not an artificial water level had been established in front of defendant's plant by the Ellsworth dam, which defendant had a right to restore and maintain, will be referred to more fully later in the opinion. Numerous points are made and argued, but the determination of the case hinges on some of the major propositions.

Another matter should be first referred to. In plaintiff's chain of title to his property is a warranty deed from White to Stevens and others, executed at about the time or shortly before plaintiff's mill was built, which recites the conveyance of the land and of the mill, with its appurtenances, and all the water power on the tract of land. Appellee contends that this gave him the right to the natural flow of the stream to the half-section line, which is a considerable distance east of and down the stream from the east line of plaintiff's property, and that the court should have so held. But the plaintiff is content with the decree, and has not appealed. Plaintiff alleged, as ground for equitable relief, that he had already suffered serious damage and irreparable injury. The trial court, by its decree, reserved that question, and expressly provided that plaintiff was not barred from maintaining an action against defendant for damages.

1. We shall first take up the propositions relied upon by appellee, some of which are not controverted by appellant, and then refer to defendant's points, which are in the nature of affirmative defenses, and pleaded by it as such. The nature of the right which a riparian owner has with reference to a stream or river which crosses land owned by him is well settled in this state. Such an owner is entitled to have the flow of water on his land at his upper property line, and off his land at the lower

property line, as the natural grade at the bed of the stream will permit, with this qualification : that the upper owner may reasonably detain and reasonably use the water as it passes over his property. It is appellee's contention that, in the absence of adverse user or grant, there is no authority which can justify a lower property owner in interfering with the get-away which nature has placed upon a certain piece of land; and that though, as held in *Marshall Ice Co. v. LaPlant,* 136 Iowa 621, 637, the right may be lost by grant or prescription, defendant in the instant case cannot and does not claim any such grant or prescriptive right, as against the plaintiff. It is his contention that he, as a riparian owner, has the right to the full enjoyment of the natural fall of the stream as it is accustomed to pass through his premises. On this proposition he cites *Gehlen Bros. v. Knorr,* 101 Iowa 700; *Marshall Ice Co. v. LaPlant,* supra; *M'Calmont v. Whitaker,* 3 Rawle (Pa.) 84 (23 Am. Dec. 102); *Omelvany v. Jaggers,* 2 Hill. (S. C.) 634 (27 Am. Dec. 417); *Brown v. Bowen,* 30 N. Y. 519 (86 Am. Dec. 406); *Barnard v. Shirley,* 151 Ind. 160 (41 L. R. A. 737, 759); *Avery v. Vermont Elec. Co.,* 75 Vt. 235 (59 L. R. A. 817); 27 Ruling Case Law 1196; Farnham on Waters & Water Rights, Sections 471, 547, 548. Appellee concedes that this privilege is to be limited by the ordinary conditions as they prevail at extraordinary times of the year : that is, what the right of fall should be at the varying water stages. *Decorah* cases, 49 Iowa 490, and 58 Iowa 97. We do not understand appellant to dispute these legal propositions, —that is, they do not deny that they are the law as general propositions; but they contend, as will be stated later, that, since plaintiff's mill is not modern, and not equipped with modern machinery, he is limited to such a head of water as, in connection with the ordinary flow of the stream, utilized through standard wheels, etc., will produce such an amount of power as is sufficient to operate plaintiff's mill, and produce the maximum output which the machinery now installed is capable of producing, and so on. Some of the cases cited by appellant are among those cited by appellee. They cite *Gehlen Bros. v. Knorr,* supra; *Gibson & Kloppenstein v. Fischer & Orton,* supra; *Price v. High Shoals Mfg. Co.,* 132 Ga. 246 (22 L. R. A. [N. S.] 688); *Bass v. City of Fort Wayne,* 121 Ind. 389 (23 N. E. 359). Ap-

pellant emphasizes the thought expressed in the *Gehlen* and other cases, that, as between himself and another dam owner, a mill owner is confined to a reasonable use of the water of the stream, with due regard to the rights of other riparian owners, and that, in determining what is a reasonable use, all the circumstances must be considered: what the use is for; its extent, duration, necessity, and application; the nature and size of the stream, and the several uses to which it is put; the extent of the injury to one proprietor and of the benefit to the other; and so on. These legal propositions are not disputed by appellee.

2.   It is also contended by appellee that, under the deed from White to Stevens, before referred to, the land severed from the mill site property was a servient estate, with respect to that easement (27 Ruling Case Law 1242, *Fayter v. North*, 30 Utah 156 [6 L. R. A. (N. S.) 410], 59 L. R. A. 833, 9 Ruling Case Law 802, 803) ; and further, that such an easement inhered in the dominant estate, and passed with it (48 L. R. A. [N. S.] 387, *Brossart v. Corlett*, 27 Iowa 288, 19 Corpus Juris 948) ; and that special mention of an easement need not be made in the deed (*Brown v. Honeyfield*, 139 Iowa 414, *Marshall Ice Co. v. LaPlant*, supra, *Decorah* case, 49 Iowa 490, *Karmuller v. Krotz*, 18 Iowa 352, 27 Cyc. 513) ; that this is especially true where the property conveyed is a mill property (27 Ruling Case Law 1243).

3.   It is also contended by appellee that the violation of plaintiff's right by damming the water so as to throw backwater on his land gives him, as an upper riparian owner, a right of action (citing the two *Decorah* cases and the *Gibson & Kloppenstein v. Fischer & Orton* case, supra) ; and that equity has long recognized this as a case for abatement and injunctive relief. *Troe v. Larson*, 84 Iowa 649; *Falcon v. Boyer*, 157 Iowa 745; *Decorah* cases, supra. See, also, *Cantril Tel. Co. v. Fisher*, 157 Iowa 203, 210.

4.   It is argued by appellee that the balance of conveniences to the parties is immaterial when the act is wanton and tortious; that defendant's acts were so, for that it made no survey before building its dam, or effort to determine the effect it would have. 14 Ruling Case Law 357, Sections 60, 61; *American Smelting Co. v. Godfrey*, 158 Fed. 225, 231; *Hulbert v. Cali-*

*fornia Portland Cem. Co.,* 161 Cal. 239 (38 L. R. A. [N. S.] 436) ; *Sullivan v. Jones & L. S. Co.,* 208 Pa. 540 (66 L. R. A. 712) ; *Bliss v. Rice,* 17 Pick. (Mass.) 23.

Plaintiff has suffered some damages, and not merely nominal damages, as contended by appellant. Defendant's plant will not be destroyed, and the public deprived of the benefit thereof, as contended by appellant; but, on the contrary, as we have already said, the trouble can be remedied without undue hardship by lowering its dam to the point indicated by the decree. The loss to the defendant would not be altogether disproportionate to the injuries sustained by the plaintiff, as argued by appellant. A large number of cases are cited by appellant as holding that, where the damages suffered by plaintiff are nominal, or the injury is slight, or where the damages sustained can be admeasured and compensated, equity will not interfere, where the public benefit outweighs private and individual inconvenience, or where defendant will suffer great damage, while plaintiff's damage is slight or doubtful; and that there is a discretion in the court in granting or withholding equitable relief. Among the cases so cited is *Daniels v. Keokuk Water Works,* 61 Iowa 549, where smoke and gases from defendant's smokestack were carried upon plaintiff's property, and inconvenience and annoyance were occasioned thereby. but no injury to health, destruction of property, or other irreparable injury was shown; and it was held that equity would not interfere. See, also, 6 A. L. R. 1575, note; and *Town of Bristol v. Palmer,* 83 Vt. 54 (31 L. R. A. [N. S.] 881). Many cases are there cited where it is held that, whenever the nature of an injury resulting from a nuisance caused by smoke alone is such that it is continuous, irreparable, and the cause of real damage, and incapable of adequate compensation by damages in an action at law, equity will afford relief by injunction. Other cases cited by appellant are *Andrus v. Berkshire Power Co.,* 145 Fed. 47; ibid, 147 Fed. 76; *New York City v. Pine,* 185 U. S. 93; and other cases. It may be true, as argued, that plaintiff, in fixing the value of his property, overestimates its value, and that he overestimates the extent to which he will be deprived of power, and the depreciation in the property. It not infrequently happens that owners of property overestimate the value of their

own. ·We are satisfied that he has sustained and will sustain some damage, and that an action at law for damages is not an adequate remedy. As said, the expense to the defendant in reconstructing its intakes is not disproportionate to plaintiff's injury, and the plant of defendant can be efficiently and profitably operated for the good of ·all, .without undue expense or hindrance, and at the same time the rights of plaintiff can be observed; and the decree does preserve plaintiff's rights, and. does no more. Since the question as to the amount of plaintiff's damages has been reserved for a jury, we refrain from further discussion thereof.

In some of the negotiations, after the suit was brought and before trial, looking to a settlement of the matter, an officer of defendant company suggested that plaintiff install electric equipment and sell to the defendant his entire output, defendant in turn selling plaintiff such energy as would be necessary to operate the mill. It is suggested that plaintiff could, at a slight or reasonable expense, put in flashboards, or raise his dam, build new trash racks, and secure new and modern wheels, and so on, and thus obtain more power for his mill. It is stated in argument, and not denied, that, since the trial, plaintiff did commence to put in flashboards, and that defendant began an injunction suit to prevent his doing so. If plaintiff should attempt to raise the level at his upper line, it might involve him in litigation with upper owners. However this may be, it appears to us that it is not so much a question as to what might be done at plaintiff's upper line. The defendant is below, and the only complaint against it is that it is interfering with the plaintiff's enjoyment of the natural fall of the stream as it flows through his property, and with his right to have his water leave the lower line in accordance with the speed and under the conditions imposed by nature. ˙This is the right. which the court protected by its decree.

In this connection, it is claimed by defendant that plaintiff could install new and more efficient wheels and machinery, and produce the maximum output of the machinery now installed,
2. WATERS AND     and that he is only entitled to maintain a head
WATERCOURSES:     of water at his dam sufficient to operate his mill
dams: unlawful
interference.     with the more efficient machinery. The trial

court held, and properly so, we think, that this is no defense. It may be true that plaintiff's mill and machinery are old, but it appears that plaintiff was engaged in the flour and feed business, and was manufacturing such flour and feed, and had in good faith utilized the water power in grinding products which he sold in his business in the town. The power and the mill and its equipment were sufficient for his purpose, and could be used by him profitably. In addition to that, he owned the land, and the nature of the stream at that point was such as to make his right of fall of intrinsic value.

5. It is contended by appellant that, when it commenced its dam, the Ellsworth dam below was in; that, in that situation, the water was backed up so as to raise the level as far up as plaintiff's dam; that it raised the water there; and that it raised the water at the defendant's dam, so that the water was of sufficient depth to permit the use of its intake, as now constructed. The claim is that an artificially maintained level of water in a river, by prescription, takes the place of a natural level, and that defendant is entitled to maintain the water as it was at its plant when the Ellsworth dam was in the river. On this proposition, they cite *Kray v. Muggli*, 84 Minn. 90 (86 N. W. 882); *Smith v. Youmans*, 96 Wis. 103 (70 N. W. 1115); *Hollett v. Davis*, 54 Wash. 326 (103 Pac. 423); *Taggart v. Jaffrey*, 75 N. H. 473 (76 Atl. 123). The claim is that defendant, as a riparian owner above the Ellsworth dam, has a reciprocal right to have the water level maintained as it was during the time the Ellsworth dam was in.

3. WATERS AND WATERCOURSES: dams: nonprescriptive right.

None of the cases cited go so far as to hold that this reciprocal relationship exists as to anyone except the one who has maintained the obstruction that caused the artificial water level. Conceding that the fact that Ellsworth maintained the water at an artificial level until the defendant and other upper proprietors acquired a prescriptive right to its maintenance and improved their properties at great expense, relying on the continuance of the higher level, could prevent Ellsworth and all those claiming under or through him from reducing the level, to the injury of defendant and other upper proprietors (*Kray v. Muggli*, supra), the question here is whether defendant has

such a right as against the plaintiff. It is not shown that defendant owns the Ellsworth dam site, or any rights which might be incident thereto. If it was such owner, then it would, of course, succeed to whatever rights the Ellsworth dam had to back water up on the plaintiff's property. Defendant is not in a position to say that, because it has a right against Ellsworth to have the higher water level maintained, it has a right as against plaintiff to maintain that water level. Furthermore, the dam was out, at the time defendant's engineer sought to fix the height to which the Ellsworth dam was finally maintained, and under such circumstances, this was more or less a matter of conjecture. The Ellsworth dam has not been restored. The prescriptive period has not elapsed. It is shown that the Ellsworth dam was modified at or about the time of its installation, so as to back water up to the half-section line east of Oak Street, which is about 1,000 feet below plaintiff's east property line, and that Ellsworth recognized that his right to back water was limited by the half-section line above referred to; so that defendant, in seeking to acquire any right by virtue of the maintenance of the Ellsworth dam, must take it with the limitations recognized by the lower riparian owner, Ellsworth.

Under the entire record, we think that appellant has not the right, as against plaintiff, to have the alleged artificial water level maintained.

6. As to the alleged acquiescence and estoppel of plaintiff, and his alleged waiver of the right to an injunction by claiming damages, we think these points are not well taken. On this branch of the case, appellant relies largely, if not entirely, upon negotiations and correspondence between plaintiff and defendant and their counsel, in regard to the case. This correspondence was after this action had been begun, and while it was pending, wherein plaintiff was asking injunctive relief. While the question of damages is referred to, we think there is no waiver. Whatever delay or so-called acquiescence there was, was more at the instance of defendant. There is nothing to show any change of position by defendant to its prejudice, because of anything said or done by plaintiff.

We reach the conclusion that the decree of the trial court was right, and ought to be affirmed. It is—*Affirmed.*

EVANS, STEVENS, ARTHUR, and FAVILLE, JJ., concur.

DE GRAFF, J., would modify and affirm.

### SUPPLEMENTAL OPINION.

PER CURIAM.—The decree of the trial court provided that the defendant should have a specified time within which to comply with the provisions of the decree. The decree in regard to time is approved, but the time is extended four months from the date of the filing of this supplemental opinion.

Upon further consideration, a majority of the court are of opinion that additional provisions should be inserted in the decree in regard to the method of abatement, although other members of the court think the matter is fully covered in the decree as entered. The parties may, within the four months' extension of time, with the assistance of competent engineers, determine, by practical experiments made in executing the decree heretofore entered, the true and lawful height of the dam, so that the dam shall be maintained by the defendant only at such an elevation as to no longer back the water up at plaintiff's lower property at Station 23, and the dam of defendants shall be abated until it no longer backs the water up to the point just indicated. If the first reduction in the height of the dam is not sufficient to prevent the back flow of the water to the point just indicated, further abatement shall be made. At the end of said four months, the defendant shall have so lowered and abated its dam that it no longer backs the water at the thread of the stream and at plaintiff's lower property line. At the end of said four months, the decree of injunction shall be in full force in all its provisions, except as herein changed. The purpose in these changes is to omit for the present the figures 22.67 above the datum plane, and to permit experiments. The decree of the district court is changed as herein indicated. If either party desires more specific provisions as to the experiments, a decree may be prepared, served upon the opposing party, and presented to this court, with any written objections there may be thereto.

With these changes, the petition for rehearing is overruled. The costs of the appeal will be taxed to appellant.