FIN & FEATHER CLUB v. THOMAS.†

(Court of Civil Appeals of Texas. Dallas. May 6, 1911. Rehearing Denied May 27, 1911.)

1. WATERS AND WATER COURSES (§ 164*)—ADVERSE HOLDING — INTERRUPTION — CONSENT.

Where defendant, without authority, flooded plaintiff's land to increase its hunting and fishing facilities, and plaintiff's predecessors in title for different periods had executed written agreements with defendant concerning the hunting and fishing privileges to be exercised on the lake so formed, which covered part of the land of both plaintiff and defendant, such agreements constituted an implied consent by plaintiff's predecessors in title to the flooding of the land, which interrupted the time necessary to vest defendant with a prescriptive easement to flood the land, and, the remaining time being insufficient, defendant had no easement to maintain the lake, nor had plaintiff a right to insist that defendant maintain it at its ordinary level.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 164.*]

2. EASEMENTS (§ 7*)—PRESCRIPTION.

One in adverse possession of another's land claiming an easement acquires an easement as of right after the continuance of such possession for 10 years.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 16–19; Dec. Dig. § 7.*]

3. WATERS AND WATER COURSES (§ 164*)—RECIPROCAL EASEMENTS.

Where a landowner acquires a right to flood adjoining land by adverse possession, the

owner of such adjoining land by the same act acquires a reciprocal easement to have the water maintained at the same ordinary height.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 164.*]

4. WATERS AND WATER COURSES (§ 178*)—INJURIES TO LAND—MEASURE OF DAMAGES.

Where an adjoining landowner permanently injures the land of another by withdrawing therefrom the waters of an artificial lake, the measure of damages is the difference in value of the land before and after such withdrawal.

[Ed. Note.—For other cases, see Waters and Water Courses, Dec. Dig. § 178.*]

5. FISH (§ 5*) — OWNERSHIP — ARTIFICIAL LAKE.

Fish confined in an artificial lake belong to the owner of the land covered by the water in which they are found.

[Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 11–15; Dec. Dig. § 5.*]

6. FISH (§ 5*)—ARTIFICIAL LAKES—TRAPS.

Where defendant wrongfully traps fish from an artificial lake, and induces them to swim through same into waters belonging to it, it becomes liable to plaintiff for their value.

[Ed. Note.—For other cases, see Fish, Cent. Dig. §§ 11–15; Dec. Dig. § 5.*]

Bookhout, J., dissenting.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by W. L. Thomas against the Fin & Feather Club. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Word & Charlton, Carden, Starling, Carden & Hemphill, and Walter F. Seay, for appellant. Leake & Henry, for appellee.

BOOKHOUT, J. This suit was brought in the district court of Dallas county, Tex., by W. L. Thomas, as plaintiff, against the Fin & Feather Club, a corporation, duly incorporated under the laws of Texas, and residing in Dallas county. Plaintiff alleges: That he purchased and became the owner of 186 acres of land on the 8th day of September, 1908; that at the time of the purchase of said land there was on said land, and had been for many years, a valuable lake of water which enhanced greatly the market value of the entire tract of 186 acres. That said tract of land consisted of a farm on which was situated a residence and other improvements. That plaintiff moved on said land at date of purchase and occupied it as a home for himself and family, and, in addition to the cultivation of said premises as a farm, he used said lake of water which covered part of his farm for his convenience, and that of his family, and proceeded to make improvements and preparations whereby he could make said lake profitable to him. He built a house on margin of lake, and purchased boats, and advertised the benefits and advantages of said lake, and offered for sale to sportsmen and others seeking pleasure fishing privileges at said lake. That, after plaintiff had gone to expense and made preparation for the profitable use of said lake, the defendant became angered at plain-

tiff for said use and drained the lake on plaintiff's premises, and drew off the fish that were in said water, and totally destroyed said lake. That as a result of the removal of said lake from the premises of plaintiff the 186 acres of land belonging to plaintiff was depreciated in its market value in the sum of $10,000. That he was also deprived of the revenue which he was entitled to obtain, and would have obtained from said lake, had it been permitted to remain on said premises, of not less than $20 per day. In addition to said actual damages, plaintiff also sued for $2,500 exemplary damages. As to the ownership of the said lake that covered a portion of plaintiff's land, it was alleged that said lake was lawfully on the land of plaintiff and defendant. That the water in said lake had been impounded by a dam or embankment erected on the land of the defendant, which dam had been maintained for a period of 20 years. That defendant had acquired a prescriptive right to back the water on plaintiff's premises, and that plaintiff had in law and equity acquired and become vested with a mutual or reciprocal right to have the said lake kept on his premises and maintained at substantially the same level at which it had been kept and maintained during said prescriptive period That at the time said lake was drained by the defendant the plaintiff and the defendant each had the mutual right that said lake should continue, in that the same had been in existence, and each of the said premises had enjoyed and been subjected to the mutual easement of the existence of said lake, notoriously and undisputedly with a claim and a recognition of the mutual right therein for a period of more than 20 years prior to the wrongful acts complained of in destroying plaintiff's lake. That the defendant and the predecessors in plaintiff's title of the 186 acres acquired by plaintiff, as aforesaid, had mutually contributed to the creation and the maintenance and the pleasant enjoyment of the said lake as a whole from the beginning of its existence, and thereby each had become impliedly bound, by implied covenant and agreement, that said lake should be so continued and maintained. That defendant drew water from said lake by cutting its levee or dam on its own land next to the land of plaintiff and thereby drew water from its own lake; and, as the waters on its own lake receded, the waters on the plaintiff's lake likewise receded and were drawn off. That the drawing off of said water did not destroy the lake of defendant, but, on account of the higher lay of the land on plaintiff's premises, the water from his premises was entirely drawn off and his lake totally destroyed.

The defendant answered by a general denial, and specially pleaded that, if defendant owned the right to back the water on plaintiff's land by prescription, said right was acquired for the exclusive purpose of hunting and fishing, and expressly denied any reciprocal rights of plaintiff in said water, and denied that any of plaintiff's predecessors in title ever contributed to the creation, maintenance, and enjoyment of said lake, and denied any covenant or agreement that said lake should be continued and maintained for plaintiff or those from whom he bought. Defendant, further answering, alleges: That, if it cut down and drew water through its dam from its own lake, it was only for a temporary purpose of supplying one of its adjoining lakes with sufficient water to protect its fish from threatened destruction, and, when 19 inches of water had been drawn off through opening in said dam, the opening was closed, and it was restored to its original condition for impounding water from the expected spring rains that usually fall in March, April, May, and June. That by the act of God said rains did not come and the extreme drouth of the spring and the summer of 1909 dried up the water of defendant's lakes until the surface area of said lakes was reduced from 500 to 50 acres, and that part of the lake on plaintiff's land called Gaston slough was left without water by said drouth. That, when the usual and customary rains fall, the said lakes will be filled and restored, and the waters will again be backed up and maintained on plaintiff's premises. That during the past 20 years said slough has frequently been dry, and no particular water level has ever been maintained, but said water is high or low according to the seasons and rainfall during the past 20 years. That for the past 10 years prior to the suit defendant has annually drawn water from one lake to another for the protection of its fish and the good of the club. Defendant, further answering, alleges that it owned the exclusive right to hunt and fish in said lake, to the utter exclusion of the public, and that Gaston slough, on plaintiff's premises, formed a part of its lake. That defendant acquired an easement in said Gaston slough, and exclusively owned the dominant estate therein for hunting and fishing. Plaintiff bought said 186 acres of land with full notice of defendant's rights therein, and soon thereafter commenced to trespass on defendant's rights and to assert absolute title to said Gaston slough and to the hunting and fishing privileges therein, and ejected defendant therefrom, and stretched a wire fence across said slough so defendant could not use it, and put nets and seines in said slough, and by means thereof took and destroyed the fish in the waters of said slough, and invited the public to said slough and offered to sell hunting and fishing privileges in said slough against the protest of the defendant, and in violation of its rules and regulations, and sought to vex and annoy and harass defendant and to injure its property. That defendant had a written agreement with M. R. Bateman, from whom plaintiff bought his 186 acres of land. That said Gaston slough could

not be used by Bateman except under rules of the club. That poachers should be kept off and out of the slough and denied the privilege of hunting and fishing and there should be nó seining and netting of fish. By supplemental petition, plaintiff alleged, in reply to the defendant's plea, that defendant had a written contract with M. R. Bateman that said Gaston slough could not be used by Bateman, except under the rules of the club; that the alleged contract between the defendant and Bateman was a mere personal covenant of Bateman's, not running with the land, and not reaching to the question of the existence of the lake on the plaintiff's land, and, further, that this contract had been annulled and breached by the defendant by its conduct complained of in this suit, and had been expressly repudiated by the defendant, in that the plaintiff had been denied any enjoyment of the rights conferred on Bateman under the said contract.

Briefly stated, the plaintiff as a predicate to his right to recover claimed: That prior to the construction of the dam of the defendant on its premises which adjoined those of the plaintiff there had existed a fine natural fishing lake which was fed at its head by a spring located on the line of plaintiff's premises, and that by reason of the active flow of the water through this lake the channel was kept cut deep. That about 20 years prior to the institution of the suit the defendant threw up a permanent dam on its premises, the immediate and continued effect of which was to establish a lake both on the premises of the plaintiff and of the defendant. That the right to maintain this lake was adversely exercised by the defendant for a sufficient length of time to perfect a right to maintain the lake on the premises of plaintiff by prescription. That, by reason of the dam, the water on the plaintiff's premises became dead, and the channel filled up with sediment, so that the lake of the plaintiff formerly existing was destroyed if the lake created by the dam of the defendant should be removed from the plaintiff's land. That, on the faith of the level of the lake being maintained substantially as it had been maintained by the defendant during the prescriptive period, the plaintiff built a house, purchased boats and equipment, and incurred considerable expense for the use of that portion of the lake on his premises, and the lake as it had been made and had continued from the time of the construction of the dam of defendant had become and was a valuable adjunct to plaintiff's farm, and added distinctly to its market value. That shortly prior to the institution of the suit the defendant, without regard to plaintiff's rights and for the purpose of injuring him, had planted in the water of the lake on its premises just outside of the line of the plaintiff's premises a skillfully contrived net which had an opening in the center, and then, by opening its dam and permitting the water to re-

cede, had invited the fish in the lake from the premises of the plaintiff onto the premises of the defendant, and, by reason of the manner of the construction of the net, the fish went from the premises of the plaintiff to the premises of the defendant, and were not able to return. That the plaintiff, in order to stop the wholesale capture of the fish which were in the lake on his premises and which belonged to him, placed a net without any opening in the center inside of his own premises, which net the plaintiff subsequently found had been raised from the bottom and the fish allowed to pass under it from off his land. That the defendant then drained the water from the lake on plaintiff's land, and had constructed an outlet in its dam at a much lower level than had ever existed before and intended and had permanently destroyed the lake on the plaintiff's premises, depriving him of the fish which were in his water and of the lake itself, leaving on his land nothing but a bog or marsh and greatly depreciating the market value of his entire farm.

The case was tried by a jury, and a verdict returned in favor of plaintiff, W. L. Thomas, for $1,000 actual damages, and $500 vindictive damages, and judgment was rendered in favor of plaintiff against defendant for $1,500. Defendant's motion for new trial having been overruled, it perfected an appeal.

[1] Under its first and second assignments of error, appellant contends that the uncontroverted evidence shows that the defendant was under no legal obligation to maintain and hold for plaintiff the water upon the plaintiff's land at the time it was drawn off, and a verdict should have been directed for defendant. The evidence shows that one Mitchner owned a farm of about 400 acres which extended from Hutchins eastward to the overflow land of the Trinity river. The headwaters of the branch are up near the town of Hutchins. From the headwaters of the branch down to the overflow bottom land is about a mile long. There was a channel about 150 yards long and from 30 to 50 feet in width on the east end of the branch. About 30 yards of this channel was on the land now owned by the club, and which is adjacent to and east of Thomas' land, which was once owned by Mitchner. About 20 years ago the Fin & Feather Club bought the land east of and adjoining the Thomas land and first built a circular levee on its land, beginning about 200 yards north of this Mitchner slough, and impounded water and made a lake on its land which backed up and extended up the Mitchner branch. The Fin & Feather Club first put in one lake on its land which connected with Mitchner or Gaston slough. The club by its first dam raised the water in the slough considerably higher than it had been before. On the branch and west of the club property about 150 yards there was a good spring on the Thomas land on the edge of the channel of the branch. Before the club erect-

ed its dam, this spring furnished living water, which never dried up from the spring eastward and formed a pool of water 150 yards long and from 30 to 50 feet wide. It was wider at east end and extended over to the club's land for a distance of 30 yards. All the branch that was covered by the waters from the club lake would overflow from the Trinity river in times of high water. Mr. Gaston owned the Thomas land when the dam was built and water impounded. The club by its dam raised the water in the Mitchner or Gaston slough about 3½ feet over what it usually stood before the dam was built. Plaintiff testified that he bought 186 acres off the old Gaston homestead in September, 1908, from M. K. Bateman. There was a lake on the land when he bought, and he thought there were four or five acres of land covered by the lake. It was known as the Mitchner slough. It was fine fishing. In January, 1909, he began to make a revenue out of it by selling fishing privileges to the public. About May 1, 1909, the defendant commenced to draw off the water from plaintiff's lake. Mr. Snow, the keeper of the club's lake, and Mr. Carter, one of the officers of the club, came to plaintiff, and asked him what he was going to do about fishing. No agreement could be made. The defendant cut its levee and in about 15 days let the water off the lake and left part of the lake on plaintiff's land a mud hole. The level of the lake was reduced three feet by the cutting of the levee. Snow, the keeper for the club, came to Thomas in a friendly manner, and wanted to know if he, Thomas, would make same agreement as Bateman about the fishing. Thomas posted his ground and made no agreement. John Gaston, a witness for the plaintiff, testified that he became the owner of the place now owned by Thomas in 1894, and remained the owner of same until 1902. Gaston lived on said land and made it his home from 1894 to 1902. He had a verbal agreement with the Fin & Feather Club that he could shoot and fish on the club's lake, and the club could use that part of the lake on his land for hunting and fishing. Gaston turned over to the club the control of the lake on his land, so that he would not be annoyed by anybody coming through, but he could use his lake for himself for hunting and fishing, and the club never denied his right to do so. The club people always treated him right. Gaston sold the farm to M. K. Bateman in April, 1904. A written agreement was introduced and read in evidence by the defendant, executed by M. K. Bateman and wife and the Fin & Feather Club, dated the 20th of April, 1904, which was duly acknowledged and recorded in Dallas county deed records. By said agreement Bateman and wife conveyed to the Fin & Feather Club the exclusive right to the hunting and fishing privileges on Mitchner slough on the land bought by Bateman from John Gaston April 9, 1904. It was provided in said agreement that no one else could hunt and fish in said slough outside of club members

except Bateman and his guests when personally accompanied by him. It was agreed that all parties to the agreement would co-operate in keeping out and excluding from said slough all trespassers. This agreement was determinable at the pleasure of either party on giving 30 days' written notice to the other party. The agreement was never terminated by either party. Bateman sold the 186 acres to W. L. Thomas in September, 1908. Plaintiff in his petition alleged that defendant had acquired a prescriptive right in the Thomas land and owned an easement in said land, and had the right to overflow said land; that the plaintiff had a mutual right and easement in said water and the enjoyment thereof, and that plaintiff and defendant had mutually contributed to the creation and the maintenance of said lake, and each had become impliedly bound to the other that said lake should be continued. The court in its charge made plaintiff's right of recovery rest on the prescriptive right of defendant to flood the land of Thomas acquired by adverse possession and also on the prescriptive right of defendant, acquired by prescription or limitation, to have the defendant to continue the lake and to continue to back up said water and flood the land on Mitchner slough. There was no evidence that Thomas or any previous owners of the land occupied by Mitchner slough ever contributed to the building of the levees or dams on the club's property or ever had any agreement about maintaining said levee or lake, with the club or any one else.

The theory upon which plaintiff recovered was that the club by building a dam on its own premises having created an artificial lake on its own land, also on the land adjoining, now owned by Thomas, the right to maintain the artificial lake having become perfected by prescription, that Thomas has a mutual prescriptive right to have the lake on his premises continued so long as the prescriptive right of the club to flood his property is asserted, and particularly when Thomas, the adjoining landowner, has incurred expense on the faith of the level of the lake as maintained during the prescriptive period, and who, through the maintenance of the artificial lake, has lost a natural lake existing prior to the artificial lake. The recovery is challenged by the appellant on the ground, as we understand it, that no prescription is shown on the part of the club to flood the land of Thomas and maintain its lake over the property known as Mitchner slough or Gaston slough, and for this reason the court erred in refusing to instruct a verdict for defendant. The evidence shows that the club dam was erected and Mitchner slough flooded in 1894, and that said slough has continuously remained flooded up to the time the club people cut its levee and drew off the water in 1909. The building of the dam by the club on its own land and the causing the land of the owner of Mitchner slough to be flooded was clearly a trespass. The club does not contend that it had any permission to flood

Mitchner slough at the time it erected its dam. The club being a naked trespasser upon the land, it, under the law, remained such trespasser, unless its possession has ripened into an easement. As stated, it has continuously maintained its dam and flooded the slough from the time of building the dam up to the time it cut its levee and drew off the water, a period of 15 years.

[2] In this state a person in the adverse possession of another's land, claiming an easement, acquires an easement if such possession continues for 10 years. Railway Co. v. Wilson, 83 Tex. 153, 18 S. W. 325; Hall v. City of Austin, 20 Tex. Civ. App. 59, 48 S. W. 53; Klein v. Gehrung, 25 Tex. Supp. 233, 78 Am. Dec. 565. The claim of the club people to flood Mitchner slough was continuous and adverse, unless it was consented to by Gaston in making the verbal agreement, giving him the right to hunt and fish on the club lands, and giving the club members the right to hunt and fish in Mitchner slough, and by the written agreement with Bateman and wife giving them the right to hunt and fish on the club property, and giving the members of the club the exclusive right of fishing and hunting in Mitchner slough, except as to Bateman and his guests, when accompanied by him.

The majority of the court are of the opinion that these agreements amounted to a consent to the flooding of the land, and that during the time said agreements were in force there was no adverse possession, and that such time should not be considered in determining whether the club's possession had ripened into an easement. Deducting the time that these agreements were in force, 10 years had not elapsed from the time the slough was first flooded by the club and the time of filing this suit. The writer does not concur in this view, but is of the opinion that the privilege given verbally by Gaston and subsequently by written contract by Bateman and wife to the club members to fish and hunt in Mitchner slough was purely a personal privilege given in view that the club had granted to Gaston and to Bateman and wife the right to hunt and fish on the club's property, and had no bearing upon the club's right to flood Mitchner slough. The right to fish and hunt on the land of the club was consistent with, and not adverse to, the club's right to flood Mitchner slough. Mitchner slough was flooded by the club, and the prescriptive period had begun to run prior to either of these agreements. We all agree that, if the prescriptive period had run and the club acquired a right by prescription to back the water on the land now owned by Thomas, then Thomas acquired a reciprocal right to have the water in his own lake continued and maintained at its usual level. Belknap v. Trimble, 3 Paige (N. Y.) 577; Smith v. Youmans, 96 Wis. 103, 70 N. W. 1115, 37 L. R. A. 285, 65 Am. St. Rep. 30; Pewaukee v. Savoy, 103 Wis. 271, 79 N. W.

436, 50 L. R. A. 836, 74 Am. St. Rep. 859; Kray v. Muggli, 84 Minn. 90, 86 N. W. 882, 54 L. R. A. 473, 87 Am. St. Rep. 332; Mathewson v. Hoffman, 77 Mich. 421, 43 N. W. 879, 6 L. R. A. 349; Murchie v. Gates, 78 Me. 300, 4 Atl. 698; Shepardson v. Perkins, 58 N. H. 354; Townsend v. McDonald, 14 Barb. (N. Y.) 460; Id., 12 N. Y. 381, 64 Am. Dec. 508; Case v. Hoffman, 100 Wis. 314, 72 N. W. 390, 74 N. W. 220, 75 N. W. 945, 44 L. R. A. 728; Ballard on Real Property, vol. 9, § 722.

The doctrine of reciprocal easement is not approved by Mr. Farnham in his valuable work on Water Courses. 3 Farnham on Water Courses, § 819. See, also, note to 50 L. R. A. pp. 839, 841. In view of the decisions cited, we are persuaded that the great weight of authority supports this doctrine. In this case there are strong equitable considerations tending to raise an estoppel whereby the appellant should be precluded at this late date from destroying the lake on the appellee's land. The testimony shows that, relying upon the artificial lake as created by the appellant, the owner of the appellee's land permitted the pre-existing lake on his own land to be practically destroyed by the accumulation of sediment from the artificial lake of the appellant in the overflowing of Mitchner slough; also, that the appellee had gone to considerable expense in putting in improvements in reliance upon the artificial lake upon his land being maintained at the level it had been created.

Error is assigned to the second paragraph of the court's charge, reading as follows: "You are instructed that if you find and believe from the evidence that the defendant, Fin & Feather Club, during or about the year 1894, erected a dam on its own land lying and adjacent to the farm described in plaintiff's petition, whereby the water impounded by its dam was backed over a portion of said farm described in plaintiff's petition to a certain level, and that for more than 10 years continuously prior to the drawing off of the said water, as alleged in the petition of plaintiff, the water so backed up was kept at substantially the same level on the plaintiff's premises peaceably and adversely by the defendant and that relying upon the continuance of the water at this level the plaintiff and his predecessors in title allowed the channel of the water on their land to become filled up with sediment, the plaintiff had the right by prescription or limitation that the water should after the expiration of 10 years continue to be so backed up and held on his premises by defendant at substantially the same level that it had been originally placed and maintained by the defendant." The propositions presented are: First, that the right to an easement on land can only be lost to the dominant owner by the adverse holding of the servient estate; second, that the owner of the servient estate, in order to rid himself and his land from the

burden held by the dominant owner, can only do so by 10 years adverse possession, according to definition in our statutes for acquiring title to lands by limitation. The plaintiff in his petition alleged that the defendant had acquired the prescriptive right to back the water on plaintiff's premises; that plaintiff had become vested with a mutual or reciprocal right to have said lake on his premises kept and maintained at substantially the same level it had been kept and maintained during said prescriptive period; that said lake was lawfully in existence on the premises of both the plaintiff and defendant, and each had the mutual right that said lake should continue, for the same had been in existence for 20 years on each of said premises, and each of said premises had been subjected to the mutual easements of the existence of said lake, notoriously and undisputably with a claim of recognition of the mutual right therein for said period of 20 years.

[3] The evidence was that the club constructed its dam and overflowed Mitchner slough in 1894. At that time the club had no rights in the property upon which said slough is located, and the club was a trespasser in causing the water to overflow the property of another. It remained such trespasser in continuing such overflow without the consent of the owner of the land. Under the laws of this state, if the act of the club in overflowing Mitchner slough and continuing such overflow for 10 years was adverse to the owner of the slough, then it acquired a prescriptive right in the slough to continue such overflow. If the club acquired by prescription the right to back the water and overflow Mitchner slough, then Thomas, the owner of said slough, acquired the reciprocal right to have the club maintain and continue its dam for that purpose. The evidence was sufficient to raise the issue that the act of the club in overflowing the slough was adverse to the owner of the land. There was evidence that plaintiff and his predecessors in title allowed the channel of the water on the land to become filled up by sediment, and there was no error in submitting this issue to the jury. See authorities above cited.

Error is assigned to the third paragraph of the court's charge, which reads as follows: "And if you find and believe from the evidence that, as alleged in plaintiff's petition, defendant, or its officers or agents, drained the water from the premises of the plaintiff to an unusual or unaccustomed extent, and thereby reduced the level of the water on plaintiff's land substantially maintained during said period of 10 years, and that thereby the body of water which had been on the land of the plaintiff was destroyed or impaired as a lake or pond of water, and you further find and believe from the evidence that the land of the plaintiff was damaged thereby, then you will return a verdict for the plaintiff for the amount which you find that he has been injured under the measure of damages given you hereafter in this charge." The proposition presented is that there was no evidence that defendant made use of the lake in a different way and for a different purpose than it had used same for the ten years' period. This proposition cannot be sustained. There was evidence amply sufficient to raise the issue embraced in this paragraph of the charge.

[4] Nor is there error in the seventh paragraph of the court's charge reading as follows: "In the event that you find for the plaintiff, and find that his land was damaged by the destruction or impairment of the body of water thereon, then, in determining the amount of such damage, you will find the difference in the market value of plaintiff's land immediately before the lake was drained off and immediately after the draining of the water from his land, and the amount of this difference will be the amount of your verdict on this feature of the case." The undisputed evidence showed that by the introduction of a new flume in the dam at the time the water was drained off plaintiff's premises the defendant has placed it in its power to permanently destroy the lake on the plaintiff's premises, subject only to the will of the defendant, and upon the issue submitted in the seventh paragraph of the charge the jury determined that the farm of the plaintiff was permanently injured by reason of the destruction of the plaintiff's lake, and the verdict in this respect is fairly supported by the evidence.

[5] The eighth and ninth assignments are grouped and are as follows:

"Eighth. The court erred in submitting to the jury the fifth paragraph of its charge, which is as follows: 'You are instructed that fish in water belong to the owners of the land which the water covers, and that the owners of the land covered by the water have the right to recover the value of any fish taken from the water on his own land by any person without the consent of the owner, and, if you find and believe from the evidence that the defendant by means of any drawing of water from the lake purposely drew fish from the water on plaintiff's land, then the plaintiff is entitled to recover from the defendant the value of the fish, if any, so secured from his land by the acts of the defendant.'

"Ninth. The court erred in submitting to the jury that portion of paragraph No. 7 of its charge, which is as follows: 'If you find for the plaintiff, but do not find that his land was injured in its market value from its destruction or impairment of the body of water on his land, but find that he was wrongfully deprived of his fish under the terms of this charge, then you will return a verdict for the plaintiff for the value of the fish taken from his land by the defendant.' "

It is contended that neither the pleadings nor the evidence authorized the charges com-

plained of in above assignments of error 8 and 9. Again, it is contended that it was error for the court to tell the jury that fish in water belong to the owner of the land which the lake covers and that the owner of the land could recover the value of any fish taken. These propositions are not sustained.

[6] The property in fish, when confined, as those of Thomas were, belongs to the owner of the land covered by the water in which the fish are found; and, there being evidence tending to show that the defendant willfully trapped the fish from the plaintiff's premises into its own possession, the defendant is responsible to the plaintiff, as charged by the court, for the value of the fish so wrongfully obtained from the plaintiff. The petition of plaintiff distinctly alleged the facts in regard to the fish being taken from his premises and his loss consequent thereupon. C. F. Carter testified: "Our object in putting in the screen we did was to get the fish down on our property and hold them there." 13 Am. & Eng. Ency. of Law, p. 556; Commonwealth v. Follett, 164 Mass. 477, 41 N. E. 676; Commonwealth v. Perley, 130 Mass. 469.

It is contended in the thirteenth assignment that the court erred in submitting the issue as to exemplary damages. It is insisted that there was not sufficient evidence to authorize the submission of this issue to the jury. This contention is not sustained. There was sufficient evidence to justify the giving of this charge.

There are various assignments not discussed complaining of the charge and others complaining of the court's action in the admission of evidence. These assignments have been carefully considered, and because we are of the opinion they do not present reversible error they are overruled.

For the error in refusing the charge instructing a verdict for defendant, the judgment is reversed and judgment here rendered for appellant.

The writer dissents from this conclusion, he being of the opinion that no reversible error is pointed out in the judgment, and that the same should be affirmed.

Reversed and rendered for appellant.

BOOKHOUT, J., dissents.